*190 Rush, Justice.
As my opinion differs from that of the court, just delivered by the Chief Justice, I will give the reasons of my dissent scmewhat at large.
A libel has been filed in the court of admiralty for the state of Pennsylvania, on behalf of John Purvyance, Joseph Dean and Benjamin Harbeson, against John Angus, setting forth and charging, that the said John Angus was duly appointed master and commander of the brig Hibernia, the property of the libellants, bound on a voyage from Philadelphia to the port of Qrotava, in the island of Teneriffe ; that on his voyage aforesaid, the said Angus, without any probable cause of capture, and with a view to his own private interest and emolument, did combine with certain malefactors, and take the brig Betsey out of the- possession of Silas Talbot, the said brig being at that time a prize to the said Talbot, and that Angus knew she was prize to him. The libel further charges, that Talbot hath recovered 4000Í. against the libellants for the trespass and injury aforesaid ; and concludes with praying, that as the libellants have been compelled to pay that sum of money through the misconduct of Angus, their captain, they may be enabled to recover from him a full equivalent.
To this libel, an answer hath been filed on the part of Angus, in which he explicitly denies his taking the Betsey on the high seas, without authority from his owners, and without probable cause. He also utterly denies, that he knew the brig Betsey had been taken by Talbot, and that he had any intention to defraud him, or his, Angus’s, owners.
A variety of depositions and exhibits have been produced in the cause, and the judge of the admiralty hath pronounced a decree in favor of Angus, the respondent. From this sentence, an appeal hath been brought by rhe libellants to this court, the highest in the state, having the ultimate and superintending power to correct the errors of all inferior tribunals.
It is right and proper, before we examine the evidence, accurately to state the question in controversy.
We are not now to decide, generally, whether masters of vessels are not responsible to their owners for neglect of duty, or breach of trust; it being admitted on all hands, that the master may sue his servant- for any breach of trust or confidence. If a shepherd, by his negligence, suffer my sheep to be drowned; or should my cattle, through the negligence of my servant, commit a trespass upon my neighbor ; the shepherd and servant are both liable in these cases. And in the latter case, I am responsible over to my neighbor for the injury he receives through the neglect of my servant. Doctor & Student 37; Noy 109; 5 Co. 13, 14.
Nor are we now to inquire, whether Angus be responsible to Silas Talbot for trespass. I admit, that he is clearly so ; and that no defence he could make, founded on ignorance, accident or mistake, could avail him on such suit by Talbot. If Angus joined in the trespass, it is immaterial to Talbot, what .were his views, or whether he did it intentionally, or not. If I hurt a person, through negligence, it is no justification, in an action of assault and battery. Buffer 16. And there is a case in one of the books, where a gun went off by accident, and wounded a person, and it was held that trespass lies. It is to no purpose, therefore, and wide of the present question, to cite authorities to prove that in trespass all are answerable. Whether Angus showed more or less zeal; whether he did all he could, or not, are useless *191 inquiries at this time. In trespass, all are liable ; and this rule would apply in a suit by Talbot against Angus, even though the trespass might appear, on the part of Angus, to have been incautiously, or unintentionally, committed.
The question before the court is a special one, resting on its own peculiar circumstances, and not involving in it the examination or adjustment of any general principles of law. But before I proceed to state what I take to be the question, I will make a few previous observations, on the doctrine of responsibility, so far as the same is applicable, or necessary, at present.
The owners, as well as the masters of vessels, are, by the civil law, liable for trespasses committed on the sea. The owners are liable, on the principle, that the master is their servant, bound to obey their orders, and to pursue their instructions : a confidence or trust is reposed in him, that he will cor-duct himself agreeable to the principles of integrity and good faith ; ai d that he will be guilty of no outrage upon others, nor of any criminal neglo ,t whatever. By rendering the owners responsible for the masters, the law hath laid them under the strongest obligations to employ none but men of skill, capacity and integrity, to navigate their vessels. Perhaps, too, the principle in part received its establishment, from an apprehension, that the commander of the vessel might not be of sufficient ability to compensate for the injury committed by him. In all cases of spoliation, both master and owners are equally liable to the party wronged.
But what is the nature of the contract between the owners and the master? It is either general or special. It is either created by the law, or by the parties themselves. A commander of a vessel, on going to sea without any instructions, is bound to govern himself by law ; and, in such case, if his owners are injured through his misconduct, he is certainly responsible again to them. This duty, however, which the law imposes upon the commander of a vessel, may be altered by his owners. They may, for example, order him to take and seize the vessel of a friend ; and in case of his compliance, both he and his owners will be responsible to that friend ; but the master, in this instance, will not be liable to his employers, because he acted according to instructions. The rules of responsibility, therefore, are not reciprocal. The owners may be liable to a person injured, and it will not thence follow, that the master is answerable again to his owners. These observations are made to refute a very improper inference, that because a master has injured a third person, for which the. owners are liable, that, therefore, the master is again responsible to the owners.
The question, then, before the court is this : Is Angus (who actually committed a trespass on the property of Silas Talbot, in conjunction with captains Prole and Thompson, and whose owners, the present libellants, have since been compelled to make compensation to Talbot for the trespass of Angus) responsible to his owners, for the moneys paid by them on account of the said trespass, under all the circumstances of the’ case ?
This I take to be a fair state of the question'; and the answer must depend, first, upon the evidence, and secondly, upon the law.
I have stated in the question, that Angus committed a trespass. This appears evident from his signing the orders, and from his putting two sailors on board the Betsey, to assist in navigating her into port : unless, therefore, it can be shown, that Angus was imposed upon by his comrades, Prole and *192 Thompson, lo act in this manner; and that he was authorized to place a reasonable confidence in them, the decree of this court ought to be against him. In other words, unless he can show some authority, either express or implied, for what he did, he ought to be considered in the same criminal point of view with the two other captains.
In the beginning of September 1779, the Hibernia, commanded by Angus, left the Capes of Delaware, in company with Captain Thompson, who commanded the Achilles, and with Captain Prole, who commanded the Patty. They were all armed, and had letters of marque. Upon the 6th and 7th of the same month, the transaction happened which gave rise to the present dispute. William Davis, a passenger on board the Patty, says, that on the 7th, about ten o’clock, a. m. he heard a firing, and saw two vessels engaged in battle, and that, at that time, the three brigs, the Patty, Achilles and Hibernia, were within hail of each other. This firing, if ever heard on board the Patty, or the battle seen, must have been on the sixth, and not on the seventh. He adds, that he verily believes that the two other brigs heard the firing also.
In opposition to this evidence, let us contrast the testimony of James Leach, the master, and John Russel, the mate, on board the Betsey. They both swore, that, at the time the Betsey was captured, there was no other vessel in sight but the Argo ; and they add, that they verily believe no person did see any other vessel. If they were in sight of Davis, Davis must also have been in sight of them ; and the firm belief of Leach and Russel, that no vessel was in sight, is at least equal in point of proof, to the firm belief of Davis, that the Hibernia and Achilles saw the engagement. It is remarkable too, that Davis says, that Angus had his boat hoisted out, in which he is contradicted by all the other witnesses, and appears to be under a great mistake.
But I shall waive any further observations on this point; for, though it should be admitted that Davis, and those on board the Patty, heard the firing and saw the chase, it cannot thence be inferred, that those on board the Hibernia did; especially, as they swore that they did not. Inattention, noise, and a variety of other causes, might prevent the people on board one vessel, from seeing or hearing what those on board another vessel did see and hear.
It appears to me, therefore, highly probable, from the evidence before the court, that Angus did not, on the 6th, see the taking of the Betsey. His conduct on the 7th, when he came up to the other captains, strongly confirms this idea. For no less than six witnesses out of the seven, who were present when Angus came up (that is, every witness except Davis), expressly mentions, that Angus inquired what they had got ; and upon being told she was a good prize, he replied, if she is a good prize, so must the sloop be ; and that he further asked, why one of their fast-sailing vessels did not chase her ; upon which, they ordered him to pursue her, which he immediately did.
Now, it is in full proof, from the evidence of Captain Talbot, that the-two other brigs had been up with the Betsey, about an hour before Angus came up, and that their boats had frequently passed to and from the Betsey. They, therefore, had full information ; but Angus had not the least knowledge, except what he received from their declaration, that she was a good *193 prize. If then she had been a good prize, of which he had not at that time the least reason to doubt, well might he reply, that the other vessel, meaning the Argo, was also a good prize. This observation, made at this period of the business, unanswerably shows, that he could not have seen the Betsey and Argo engaged ; for, it is not conceivable, that he could be so grossly ignorant and stupid, as to see two vessels engaged in battle, and at the same time, suppose them to be both enemies.
With respect to the idea of the three captains having consulted what to do with the prize, it scarcely merits consideration. Groves says, that he does not know on board which vessel the consultation took place ; in which he is contradicted by Davis, who says it was not on board any particular vessel, but that each captain continued on board his own. The truth, however, is, that there never was any consultation, and in this all the other witnesses agree.
The orders from the three captains to the prize-master, and which are signed by Angus, contain a direction to him to get, if possible, into Delaware, Egg Harbor, or Chesapeake, “ for fear of the sloop Argo’s falling in with you, if you go to New England.” From these expressions, it has been contended, that Angus was privy to the whole transaction ; but I do not see the thing in that point of view. It is possible, that he signed the orders without considering attentively the meaning of the words, believing, at the same time, that his comrades, who had made the necessary inquiries on board the Betsey, had their reasons for inserting them. It is certain, that he thought the Argo an enemy, and as such pursued her. He might, therefore, very naturally have supposed the other captains had reason to believe the Argo was bound to N ew England ; and that, on this account, they had inserted those words in the orders.
What, then, is the nature and history of the present transaction ? Three vessels, commissioned as letters of marque and reprisal, being about to sail at the same time from the port of Philadelphia, the owners of the Hibernia,give their master orders to cruise with the other two. He does so ; and in the course of their united operations, he is deceived and misled by them in such manner, as to concur with them in committing a trespass. Had Angus been directed, generally, to cruise, the case might have been different ; for then every degree of confidence reposed in his associates, must have been at his own risk. But Angus, being expressly authorized to cruise with the two other vessels then sailing to the east, any act or event which was likely to happen on a joint cruise by the three vessels, or which might have been rationally expected in the usual course of things, was as much authorized, as the cruising itself was. Everything usually done by persons jointly cruising, is implied in the authority to Angus to cruise with the others. The owners themselves have laid the foundation of the trust or confidence that he reposed in Prole and Thompson, and should, therefore, alone suffer. The conduct of Angus seems to be clearly warranted by the rules and maxims that invariably govern the commanders of vessels, when they act in conjunction with others on a cruising voyage. I perceive neither crassa negligentia, nor lata culpa in his behavior; and I take the law to be, as stated in 4 Burr. 2060, that he is not answerable, unless in those two cases. It is preposterous to say, that he ought not to have credited Prole and Thompson, when he was ordered *194 to join with them on a cruise. Hard is the doctrine, that a servant, who apparently acts in the best manner for the interests of his master, should be liable for unavoidable failures, especially, when they originate, not in himself, but in others : it is sufficient to deter all men from accepting a trust.
.This authority to cruise with Prole and Thompson, certainly means something ; but, if it will not justify Angus’s conduct on this occasion, it is totally insignificant and void ; and an authority to cruise with others, is an authority to do nothing ; that is, no authority at all.
However disposed to concur with my brethren in this cause, I have not been able to do it. Unanimity in courts of justice, though a very desirable object, ought never to be attained at the expense of sacrificing the judgment.
Upon the whole, as it appears to me, that Angus did not combine with the other captains to take the Betsey out of the possession of the Argo ; and that he acted such a part, as he thought would promote the interests of his owners ; my opinion is, that the decree of the lower court should be affirmed : but a majority of this court entertaining different sentiments, it must, nevertheless, be reversed.
The counsel, for the respondent afterwards moved the court for a rehearing, upon a suggestion of new evidence, &c., and upon that occasion, Judge Shippen made the following observations:—
Shippen, Justice. — When this court delivered their decree that the respondents should pay to the appellants the sum of 37951. 3s. 6d., they estimated the damages by what they conceived to be the value of the vessel and cargo, having then, I believe, no doubt but that the loss sustained was the proper measure of damages. The conduct of the respondent, though certainly unjustifiable, appeared from the evidence to be attended with such favorable circumstances, that if the idea had been entertained, that the damages were discretionary, and could have been legally diminished, I, as one of the court, should certainly have given my voice for a much less sum. Whether the court had, or had not, such a discretionary power, was not made a question on the hearing, but has since occurred to me ; and having met with a case ■which goes a great way towards establishing the principle, I should be willing to have the case reheard as to this point. The case I allude to, is that of Russel v. Palmer, in 2 Wils. 325, which was a special action on the case against an attorney, for negligence, in not charging the defendant in execution within two terms after the judgment, whereby the plaintiff lost his debt, the defendant having obtained a supersedeas, agreeable to a rule of the court of king’s bench, and had been discharged out of custody. On the trial of the cause before Lord Camden, a verdict was given for the plaintiff [*186 for 3000l., *whole debt, by the chief justice’s direction. But, after- -* wards, on a motion for a new trial, the chief justice himself, and the rest of the court, were of opinion, that he had misdirected the jury in telling them, that they ought to find a verdict for the whole debt, whereas, the action sounding merely in damages, the jury ought to have been left at liberty to find what damages they • thought • fit. Accordingly, a new trial was ordered, and on the second trial the jury were told, that they might find *195 what damages they pleased, and on some favorable circumstances appearing for the defendant, they found only 500i. in damages.
The similarity of this case with that before the court, inclines me strongly to admit a rehearing of the cause as to this point, whether, if the court should be of opinion, that the respondent is answerable on the point of gross negligence, they are bound to estimate the damages by the real loss, or whether they may not mitigate them, according to the circumstances and degree of negligence in the respondent.
The Court, on consideration, directed a rehearing as to this point only ; and, after argument, reducing the damages, they gave the following judgment :
The Court do award, that the respondent do pay to the appellants the sum of 9481.15s. 10'bid., and the interest thereof from the 22d day of January 1785, together with the fourth part of the costs by them paid in the former .cause by Silas Talbot qui tam against them and others ; and also the costs of this suit in the inferior court; and that each party pay their own costs in this court. the whole of the aforesaid interest and costs to be taxed by the register, or this court, (a)

 See the note to Talbot v. The Three Brigs, ante, p. 109.